✓ FILED ___ ENTERED
____ LOGGED ____ RECEIVED

10:46 am, Feb 01 202

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| IN THE MATTER OF THE | * | |
| SEARCH OF THE RESIDENCE | * | **FILED UNDER SEAL** |
| LOCATED AT 2195 SUGARLOAF | * | |
| PARKVIEW LANE, CLARKSBURG, | * | |
| MARYLAND 20871 | * | |
| ("TARGET LOCATION") | * | **CASE NO.** _1:21-mj-162 TMD_ |
| | * | |
| | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\***

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Jonathan B. Fugitt, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search  2195 Sugarloaf Parkview Lane, Clarksburg, Maryland, 20871 ("**TARGET LOCATION**"), further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation.  I have been in this position since January of 2017. I am currently assigned to the Washington, DC Cross Border Task Force, which is a squad that investigates violent gangs and drug trafficking and is located at the Washington, D.C. Field Office ("WFO") of the FBI. I have been assigned to this squad since June, 2017.  As part of my duties as an FBI Special Agent, I investigate criminal violations relating to narcotics trafficking, firearms trafficking, violent incidents, and gang related matters.

1

These violations can include the use of violence, committing violence, or attempting to commit violence in support of narcotics trafficking, firearms trafficking, and/or gang related matters. In addition, these violations can include conspiracy to traffic narcotics and/or firearms. Based on your affiant's training and experience, your affiant knows that individuals involved in criminal activity often communicate about their criminal activity over cellular telephones, including via text messages, telephone calls, telephone applications ("apps"), and through various social media accounts. A variety of data is thus captured by the cellular telephone being used to send and receive such electronic data, including communication logs, packet data, location data associated with the account, and the content of certain communications.  Thus, cellular telephones often retain electronic information that will assist law enforcement in identifying individuals involved in criminal activity, their respective involvement in criminal activity, and where they were located at specific times. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 231(a)(3)(Obstruction of Officer During Civil Disorder),   18 U.S.C. § 111(a)(1)(Assault of Officer), 18 U.S.C. § 1752(a)(4) (Entering Restricted Building), and 40 U.S.C. §

2

5104(e)(2)(F)(Violent Entry and Disorderly Conduct at the U.S. Capitol)( the "TARGET OFFENSES"), as further described in Attachment B, which is incorporated herein as reference, have been committed by DAVID BLAIR ("BLAIR").  There is also probable cause to search the **TARGET LOCATION**, further described in Attachment A, which is incorporated herein as reference, for the things described in Attachment B, which is incorporated herein as reference.

## PROBABLE CAUSE

### Background – The U.S. Capitol on January 6, 2021

5.      U.S. Capitol Police (USCP) USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

7.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

9.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

11.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

12.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows

an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



16.     Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

17.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S.

Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.     Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19.     At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

20.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.    An unknown subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



23.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





24.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

25.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

26.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

27.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

28.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

29.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

30.     Beginning around 9:00 p.m., the House resumed work on the Certification.

31.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

32.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted

12

evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

33.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

34.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

35.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:







***Facts Specific to This Application***

36.     On January 6, 2021, during the above-referenced events, Officer K.P. ("K.P.") of

the Washington D.C. Metropolitan Police Department ("MPD") was working his[4] evening shift

in his official capacity. During that shift, MPD Officer K.P. was directed to report to the U.S.

Capitol building to assist the U.S. Capitol Police in their duties to maintain security of the U.S.

Capitol building.

37.     Between 5:00PM and 6:00PM, K.P., along with MPD CDU (Civil Disobedience

Unit) 63, formed a line at the west terrace of the U.S. Capitol building and began moving

---

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-
d80b0b96141e

[4] Unless otherwise stated, for the safety of victims and witnesses, victims and confidential sources of
information are referred to using male pronouns (regardless of gender) and conversations about victims
and confidential sources of information have been altered as necessary to reflect male pronouns.

towards the west lawn to move individuals off Capitol grounds. CDU 63 chanted "move back" as it ordered the crowd of individuals on the west lawn to move west and away from the U.S. Capitol building. See the map below:



38.   CDU 63 advanced on the crowd as a line and managed to create space between the officers and the crowd. At 5:47 pm, while still on the west lawn, BLAIR positioned himself between the officers and the crowd and began to walk in the space while waiving a Confederate flag attached to what BLAIR later admitted was a lacrosse stick. Below are screen shots from K.P.'s body worn camera depicting BLAIR waiving the Confederate flag while standing in front of the crowd that was pushed back on the west lawn:



39.     While walking back and forth in the space between officers and the crowd, BLAIR yelled words to the effect of, "hell naw, quit backing up, don't be scared, we're Americans, don't be scared, let's go quit backing up, quit being scared." As officers advanced, K.P. shoved BLAIR back toward the crowd using his baton. BLAIR jumped back and turned to face K.P while squaring up his body to stand in front of K.P. BLAIR held the lacrosse stick attached to the Confederate flag with two hands and started shouting, "what's up motherfucker, what's up, what's up bitch?" Below are screen shots from K.P.'s body worn camera depicting BLAIR holding the stick with both hands:



40.     BLAIR thrust the stick at K.P towards the chest area, striking him. Immediately thereafter, several officers were able to restrain BLAIR on the ground using their batons. BLAIR was then removed from the west lawn and transported closer to the U.S. Capitol building where his arrest would be processed. While in handcuffs and not in response to any questions prompted by any members of MPD, BLAIR stated words to the effect of "I understand, what I did, the one

18

motherfucker swung at me so I kinda switched...so I apologize, we're done though." BLAIR provided MPD with the following as his phone number: 202-607-7210.

41.    MPD transported BLAIR to the U.S. Capitol building, where he was searched before he was turned over to USCP for processing.  During the search incident to arrest, a black bag with "TEMPO" in yellow block lettering and light in color drawstrings was recovered from BLAIR's back.  Within the bag, MPD recovered a silver knife, which BLAIR explained he had on him "cause I was worried about Antifa and other people trying to jump me." Additional items were also recovered from the bag, including tape, which BLAIR acknowledged "looks damn suspicious" and BLAIR explained "I had a flag with me, I taped it."

42.    While in USCP custody, BLAIR was transported to George Washington Hospital for a laceration to his head sustained after officers responded with batons following BLAIR's attack on K.P. BLAIR was then transported to the United States Capitol Police station, where his arrest was processed. At the time of BLAIR's processing at 1:41 am on January 7, 2021, an iPhone with a white frame was recovered from BLAIR's black bag and recorded as part of his prisoner's property. Below is a screenshot from the USCP stationhouse video depicting BLAIR in the white long sleeved shirt, with the white iPhone recovered from his black bag:



43.    In a notarized letter signed on January 9, 2021, BLAIR provided his mother, Gaye L. Blair, with permission to recover his property. USCP confirmed that Gaye L. Blair picked up property for David BLAIR, which included BLAIR's cell phone. A photocopy of Gaye L. Blair's Maryland driver's license was taken by USCP, which lists her address as 2195 Sugarloaf Parkview Lane, Clarksburg, Maryland, 20871. Information from Maryland's driver's license issuing agency confirms that a David Alan BLAIR is listed as residing at 2195 Sugarloaf Parkview Lane, Clarksburg, Maryland, 20871. This is the same address listed for Gaye L. Blair, the person identified in the notarized letter as being David BLAIR's mother and authorized to pick up BLAIR's property.

44.    The property to be seized includes laptop computers, mobile phones, and/or tablets owned, used, or controlled by BLAIR, including but not limited to the iPhone with a

white frame recovered from his belongings on January 7, 2021 (hereinafter the "Devices", further described in Attachment B)

45.     Given that BLAIR had the iPhone with a white frame on his person on January 6, 2021, there is sufficient reason to believe that evidence may be contained on the Device to include:

    a.   Images of the Confederate flag, lacrosse stick, and/or silver knife and communications regarding BLAIR's plans to use these items;

    b.   Images or videos containing BLAIR's whereabouts in Washington D.C. on January 6, 2021 and in the days leading up to January 6, 2021;

    c.   Images and communications regarding plans to travel into Washington, D.C., plans to meet up with other individuals, and plans for activity at the U.S. Capitol;

    d.   Communication after January 6, 2021 recounting events and activity at the U.S. Capitol.

46.     Your affiant has reason to believe that the iPhone with a white frame is currently located at 2195 Sugarloaf Parkview Lane, Clarksburg, Maryland, 20871 because BLAIR lives at the address along with his mother, Gaye L. Blair, who picked up BLAIR's property.

47.     Because several people share the **TARGET LOCATION** as a residence, it is possible that the **TARGET LOCATION** will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of

those computers or storage media, the warrant applied for would permit the seizure of those items as well.

## **TECHNICAL TERMS**

48.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global

23

positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE

49.      As described above and in Attachment B, this application seeks permission to seize evidence, fruits, contraband, instrumentalities, and information that might be found in the **TARGET LOCATION**, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory

cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found in the **TARGET LOCATION**, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s), justifying their seizure, for at least the following reasons:

a.      Individuals who engage in criminal activity, including to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

b.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does

not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

50.     As further described in Attachment B, this application seeks permission to seize not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s), justifying their seizure, at issue here because:

26

a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.   In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

## CONCLUSION

51.      I submit that this affidavit supports probable cause for a warrant to search the **TARGET LOCATION** described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

*Jonathan B. Fugitt*

Jonathan B. Fugitt
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on January  21 , 2021.

HONORABLE THOMAS M. DIGIROLAMO
UNITED STATES MAGISTRATE JUDGE

28

## ATTACHMENT A

*Property to be searched*

The property to be searched is **2195 Sugarloaf Parkview Lane, Clarksburg, Maryland, 20871** ("**TARGET LOCATION**"), further described as **a single story red brick house with a red door.** Your affiant confirmed the **TARGET LOCATION** looks identical to the Google image below by driving to the **TARGET LOCATION** on January 21, 2021.



1

## ATTACHMENT B

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 231(a)(3), 111(a)(1), 1752(a)(4) and 40 U.S.C. § 5104(e)(2)(F) (hereinafter the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to:

a. Clothing and accessories worn by BLAIR in videos of him in Washington, D.C., including a black jacket, grey sweatshirt, white long sleeved shirt, khaki pants, grey and black sneakers, tan and black gloves, black belt and a black in color bag with "TEMPO" in yellow block lettering and light in color drawstrings;

b. Confederate flag (approximately three feet by four feet) and lacrosse sticks;

c. An iPhone with a white frame, as well as other digital devices (herein collectively referred as "Devices") used in the commission of, or to facilitate, the TARGET OFFENSES, including coordinating travel arrangements to Washington, D.C., meeting locations on or around the U.S. Capitol, communicating with other individuals present at or around the U.S. Capitol on January 6, 2021, and documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s),

d. Records and information regarding travel to Washington, D.C. on January 6, 2021, including but not limited to gasoline and restaurant receipts;

e. Records and information relating to the identities or location of other individuals who traveled with BLAIR to Washington, D.C. on January 6, 2021;

f.  Records and information relating to BLAIR's animosity towards members of the United States Congress and Senate, law enforcement in Washington, D.C., and/or United States Government officials;

g.  Records and information relating to the layout of the U.S. Capitol and other United States Government buildings in Washington, D.C.;

h.  Records and information relating to BLAIR's radicalization against the U.S. Congress, the 2020 presidential election, the January 6, 2021 certification of the 2020 presidential election, and the January 20, 2021 presidential Inauguration;

i.  Records and information relating to phone number 202-607-7210;

j.  Records and information regarding operations of law enforcement in Washington, D.C. and around the U.S. Capitol;

k.  Records and information that constitute evidence of use, control, ownership, or occupancy of the **TARGET LOCATION** and things therein;

l.  Records and information that constitute evidence of the state of mind of BLAIR, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

m.  Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with BLAIR about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

3

2.     For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.  evidence of the times the Device(s) was used;

    f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h.  records of or information about Internet Protocol addresses used by the Device(s);

4

  i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

5

This warrant authorizes the seizure of electronic storage media and electronically stored information, but does not authorize a forensic search of the electronic storage media and electronically stored information seized.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.   The investigative team may continue to review any information not segregated as potentially privileged.